UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-60209-GAYLES

UNITED STATES OF AMERICA

v.

MAXON ALSENAT,

    Defendant.
_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO
THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds in opposition to Maxon Alsenat's ("Defendant") Motion to Dismiss the Indictment ("Motion") (DE 35). The Court should deny the Defendant's Motion because machine guns, and therefore machine gun conversion devices, are "dangerous and unusual weapons" that fall outside of the protection afforded by the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 624, 627 (2008).

**Statement of the Case**

**I.**    **Procedural Posture**

On October 26, 2023, a federal grand jury returned an indictment charging the defendant with possessing a machine gun, in violation of Title 18, United States Code, Section 922(o)(1). (DE 3). On February 20, 2024, the defendant filed the Motion. (DE 35). In the Motion, the defendant alleges that the Court should "dismiss the indictment . . . because § 922(o)(1), either on its face or as applied to Mr. Alsenat/his case, violates the Second Amendment." (*Id.* at 1). In support of his contention, the defendant cites *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). (*Id.*).

II.     **Factual Background**

On June 21, 2023, the defendant met and sold three machine gun conversion devices to an undercover law enforcement official ("UC") in exchange for law enforcement investigative funds. During the sale, the defendant explained that the devices provided to the UC had the capability of turning a semi-automatic firearm into a fully automatic firearm. The defendant further explained how to install the machine gun conversion device onto a firearm. After the sale, the defendant was arrested.

**The Law and Argument**

III.    **Machine Guns are Not Protected by the Second Amendment Because Machine Guns are Dangerous and Unusual Weapons.**

In 2008, the Supreme Court held that the Second Amendment guarantees "the right of law-abiding, responsible citizens" to keep a handgun in the home for self-defense. *Heller*, 554 U.S. at 635. The Supreme Court based its holding on its interpretation of the Second Amendment's text. *Id.* at 578. That "textual analysis," the Heller Court explained, looked to the Second Amendment's "historical background" because the Second Amendment's text shows that it had "codified a pre-existing right." *Id.* at 578, 592; *see also id.* at 603 (describing Second Amendment as "a text that was widely understood to codify a pre-existing right, rather than to fashion a new one"); *id.* at 599 (stating that Second Amendment "codified a right inherited from our English ancestors") (internal quotation marks omitted).

Based on "the historical understanding of the scope of th[at] right," *id.* at 625, the *Heller* Court recognized that "the right secured by the Second Amendment is not unlimited," *id.* at 626. To that end, the *Heller* Court said that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. And the *Heller* Court made clear

that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

In the year 2022, the Supreme Court in *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." 142 S. Ct. at 2129.  First, "[i]n keeping with *Heller*, … when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30.  Second, if a challenged regulation burdens such presumptively protected conduct, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.  This "historical inquiry … will often involve reasoning by analogy," in which courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*  To justify a modern regulation, the government need "only … identify a well-established and representative historical analogue, not a historical *twin*." *Id.* (emphasis in the original).

      A.      **The Second Amendment Does Not Protect the Possession of Dangerous and Unusual Weapons.**

Turning to the *Bruen* analysis, the Second Amendment's text does not cover possession of a machine gun because the Second Amendment's protection *only* applies to weapons in common use for lawful purposes.  Indeed, machine guns have been considered, categorically, "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, not weapons that are in common use for lawful purposes. *See United States v. Miller*, 307 U.S. 174, 182 (1939) (holding that Second Amendment protections

are not afforded to weapons considered dangerous and unusual). And while the Eleventh Circuit has not directly ruled on whether machine guns are considered dangerous and unusual weapons, other circuits have—and they have found that possession of a machine gun should not be afforded Second Amendment protections. *See e.g.*, *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 143 (3d Cir. 2016) ("[T]he Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("*Heller* did not specify the types of weapons that qualify as 'dangerous and unusual,' but the Court stated that it would be 'startling' for the Second Amendment to protect machine guns.") (citation omitted); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("The Court took from *Miller* the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service.").

Lastly, post-*Bruen*, district courts around the country have continued to uphold the constitutionality of Section 922(o)(1) in light of challenges similar to the one posed by the defendant in the Motion. *See, e.g.*, *United States v. Fisher*, 2024 WL 589115 (W.D.N.C. Feb. 13, 2024); *United States v. Jones*, 2023 WL 8374409 (S.D. Ala. Dec. 3, 2023); *United States v. Lane*, 2023 WL 5663084 (E.D. Va. Aug. 31, 2023); *United States v. Wilson*, 2023 WL 8288989 (W.D. Tenn. Nov. 7, 2023); *United States v. Bazile*, 2023 WL 7112833 (E.D. La. Oct. 27, 2023); *United States v. Sturgeon*, 2023

WL 6961618 (E.D. Ky. Oct. 20, 2023); *United States v. Cooperman*, 2023 WL 4762710 (N.D. Ill. July 26, 2023); *United States v. Kittson*, 2023 WL 5015812 (D. Or. Aug. 7, 2023).

### B. Regulation of Dangerous and Unusual Weapons is Consistent With Historical Tradition.

The "historical tradition of firearm regulation" in the United States further supports that a government may ban the possession of firearms that are not typically possessed by law-abiding citizens for lawful purposes. *Bruen*, 142 S. Ct. at 2130. The government may justify a firearms law when "historical precedent" from "before, during, and even after the founding evinces a comparable tradition of regulation," *id.* at 2131-32, based on "well-established and representative historical analogue[s]," *id.* at 2133. As established in *Heller* and reaffirmed in *Bruen*, there is a longstanding historical tradition in this country of banning "dangerous and unusual weapons." *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2143. That tradition "fairly support[s]" bans on firearms not "in common use," meaning firearms "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, 627.

Machine guns did not exist at the time of the country's founding. Machine guns entered the civilian market shortly after World War I and were soon widely used by criminals. *See* John Ellis, The Social History of the Machine Gun 149-77 (1986). But as far back as 1686, the province of East New Jersey prohibited the concealed carry of "unusual and unlawful weapons." An Act Against Wearing Swords, &c., ch. 9, in Aaron Leaming & Jacob Spicer, Grants, Concessions, and Original Constitutions of the Province of New Jersey 289-90 (2d ed. 1881).

During the Colonial era, early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."6 Recodifying this authority, colonial

Massachusetts (1692) and New Hampshire (1701) provided that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . by night or by day, in fear or affray of their majesties' liege people."7 In the late-18th century, the state of Virginia (1786) similarly provided that no person shall "ride armed by night nor by day, . . . in terror of the Country,"8 and the commonwealth of Massachusetts (1795) later again directed justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."9 Although these statutes contemplated that an affray required "something more" than merely carrying any firearm in public, *Bruen*, S. Ct. at 2145, they contemplated that it would naturally constitute affray to carry dangerous and unusual weapons, *see id.* at 2143.

Consistent with this tradition, following Independence, States regularly banned various dangerous and unusual weapons through the antebellum period and during reconstruction. States continued to punish affray under the common law understanding that "[r]iding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land." Charles Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); John A. Dunlap, The New-York Justice 8 (1815) (reiterating that "at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people" was affray); *see Heller*, 554 U.S. at 627 (collecting sources).

And at a time when a firearm typically could not fire more than a single shot, States banned other dangerous and unusual weapons not designed for lawful use. States banned certain knives—most notably, the bowie knife, a knife with a distinctive hand guard that had a large fixed blade that was sharp on one side. Robert J. Spitzer, *Understanding Gun Law History after* Bruen*: Moving*

*Forward by Looking Back*, 51 Fordham Urb. L.J. 58, 88-94 (2023). States also banned blunt weapons like "slung shots," brass knuckles, and billy clubs. The "slung shot," for example, was "a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle." *Id.* at 95-98. Because it was associated with crime, New York (1849), for example, made it a felony to "be found in the possession of . . . any instrument or weapon of the kind usually known as a slung shot." See Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404.

When machine guns became a "general societal problem" after World War I, many States banned them quickly without genuine "disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2131, 2133. As explained, the machine gun migrated from the battlefield to the civilian market following the war, and immediately caused a national crisis as criminals overpowered law enforcement officials with firearms like the Thompson submachine gun (or "Tommy Gun"). *See* John Ellis, The Social History of the Machine Gun 149-77 (1986). Shortly thereafter, States across the nation passed anti-machine gun laws, including bans.[1] *See* Robert J. Spitzer, *Understanding Gun*

---

[1] Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.R. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Apr. 27, 1933, No. 120, § 2, 1933 Haw. Laws 117; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 137.

*Law History after* Bruen, *supra*, at 61-67 (2023); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs 55, 67-68 (2017).

This wealth of historical evidence supports that from the colonial era to today, the United States has consistently banned weapons that are not typically possessed by law-abiding citizens for lawful purposes.

**Conclusion**

Indeed, machine guns have long been held by the Supreme Court to be a part of the category of weapons that can be both restricted and banned based on the fact that they are dangerous and unusual weapons. Contrary to defendant's argument that *Heller* and *Bruen* changed the Court's history of excluding machine guns and other dangerous and unusual weapons from the protections of the Second Amendment, both *Heller* and *Bruen* reaffirmed the constitutionality of the state and federal laws that prohibit and restrict private ownership of machine guns. As such, the Motion should be denied.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

/s/ *Stefan Diaz Espinosa*
Stefan Diaz Espinosa
Assistant United States Attorney
Fla. Bar No. 1010217
99 N.E. 4th Street
Miami, Florida 33132
305-961-9124
Stefan.Diaz.Espinosa@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed on March 11, 2024, with the Clerk of the Court using CM/ECF. I further certify that the foregoing document is being served this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Stefan Diaz Espinosa
Stefan Diaz Espinosa
Assistant United States Attorney