UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:23-cr-60209-LEIBOWITZ

UNITED STATES OF AMERICA,

　　　Plaintiff,

v.

MAXON ALSENAT,

　　　Defendant.

_____/

## MEMORANDUM AND ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS INDICTMENT

Imagine you are holding a plastic or metal object, measuring about one cubic inch in size, in the palm of your hand. Though it looks innocuous and cannot cause much harm by itself, Congress has declared that the object is a "machinegun" under federal law, and its knowing possession is punishable by up to ten years' imprisonment because, when attached to a firearm, it converts that weapon into an actual machinegun. *See* 18 U.S.C. § 922(o)(1); 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b).

A grand jury in this District found probable cause to believe that on June 21, 2023, Defendant Maxon Alsenat knowingly possessed such an object– a "machinegun conversion device" ("MCD")– all by itself and nothing else. Defendant asks this court to dismiss the charge, arguing that his possession of the MCD is protected by the Second Amendment and the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

The Second Amendment, of course, protects the right to keep and bear "*Arms*." U.S. Const. amend. II. An MCD however, by itself and unattached to any weapon, is not an "*Arm*" at all, as

the term was originally understood at the time of the Second Amendment's ratification. Therefore, the Second Amendment poses no barrier to the prosecution of the Defendant for knowing possession of an MCD under the Indictment and federal statutes in this case.

Defendant's Motion to Dismiss Indictment Under the Second Amendment (the "Motion"), was filed on February 20, 2024. United States Magistrate Judge Augustin-Birch, in her Report and Recommendation on Defendant's Motion to Dismiss (the "R&R"), filed March 25, 2024, recommended that the Motion be denied. The undersigned writes separately to supplement the reasoning of the R&R. This Court analyzes the Motion under the *Bruen* standard and finds firstly that machineguns, and therefore MCDs, are not protected under the Second Amendment because they are not "in common use" and are "dangerous and unusual," as many courts have found previously. Secondly, this Court finds that MCDs possessed without an underlying firearm are not "Arms" under the Second Amendment at all, and therefore are not afforded constitutional protection. Thus, upon due consideration, the Motion [**ECF No. 35**] is **DENIED,** and the R&R [**ECF No. 48**] is **ADOPTED** in full as part of this Memorandum and Order.

I.    **Procedural Background and Legal Standards a Governing Motion to Dismiss Under Rule 12(b)**

On October 26, 2023, the grand jury indicted Defendant on one count of violating 18 U.S.C. § 922(o)(1),[1] for knowingly possessing an MCD, which is a "machinegun" as defined in 26 U.S.C.

---

[1] 18 U.S.C. § 922(o)(1) states: "Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun." The exceptions in paragraph (2) are not applicable here. The definitions section, 18 U.S.C. § 921(a)(24), provides: "The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. [§] 5845(b))."

§ 5845(b).[2]  [ECF No. 3].[3]  In the Motion, Defendant seeks to dismiss the Indictment pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, claiming that § 922(o)(1) violates the Second Amendment to the United States Constitution.  [ECF No. 35].

When considering a motion to dismiss an indictment under Rule 12(b)(3), "the sufficiency of a criminal indictment is determined from its face." *United States v. Harris*, No. 23-CR-20396, 2024 WL 1052146, at *1 (S.D. Fla. Mar. 11, 2024) (citing *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992)).  The Eleventh Circuit has explained that an indictment that tracks the language of the statute is sufficient "as long as the language sets forth the essential elements of the crime." *United States v. Yonn*, 702 F.2d 1341, 1348 (11th Cir. 1983).  Therefore, for purposes of the Motion and this Memorandum and Order, the Court only considers, and takes as true, the allegations contained in the Indictment, in the light most favorable to the Government.[4]  *See Critzer*, 951 F.2d at 307; *see also United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 2012).

---

[2]   26 U.S.C. § 5845(b) provides, in relevant part (emphasis added):  "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include . . . *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  The face of the Indictment charges the Defendant *only with the possession an MCD*; the Indictment does not charge unlawful possession of any firearm, weapon, or ammunition, either assembled or disassembled.

[3] The Indictment charges that the Defendant, on or about June 21, 2023, "knowingly possessed a machinegun, as defined in Title 18, United States Code, Section 921(a)(24) and Title 26, United States Code, Section 5845(b), in that the defendant possessed a machinegun conversion device, a part designed and intended solely and exclusively, and a combination of parts designed and intended, for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, in violation of Title 18, United States Code, Section 922(o)(1)."

[4]  At the detention hearing for the Defendant on this charge, the Government proffered that this case involves the Defendant's sale of a specific type of MCD known as a "Glock switch," which was described as a "plastic piece[] that, when installed to the back of a Glock pistol . . .

II.      **The Second Amendment, *Heller*, *Miller*, and *Bruen***

The Defendant seeks to dismiss the Indictment under *Bruen*, claiming that his alleged conduct, possessing an MCD, is "covered by the plain text of the Second Amendment, and because the government cannot show that § 922(o)(1) is consistent . . . with America's historical tradition of firearm regulation[.]"  [ECF No. 35 at 2].

In *Bruen*, the Supreme Court announced a two-part test as to whether firearm regulations pass constitutional muster.  First, this Court must determine whether "the Second Amendment's plain text covers" the regulated conduct at issue.  597 U.S. at 24.  Only if the regulated conduct falls within the Second Amendment's ambit does the Court proceed to the second step to determine whether the regulation is "consistent with the Nation's historical tradition of firearm regulation."  *Id.* As set forth below, Defendant's argument fails at *Bruen*'s first step.  Machineguns and MCDs are plainly *not covered* by the Second Amendment, and the Court need not perform the historical analysis under *Bruen*'s second step.  This case shows, in two independently sufficient ways, why the law of the Second Amendment commands this result.

A.  The Second Amendment Does Not Protect the Possession of "Arms" Like Machineguns, Because They Are Not "in Common Use" and Are "Dangerous and Unusual."

The Second Amendment protects "the right of the people to keep and bear Arms[.]"  U.S. Const. amend. II.  The Supreme Court, in *District of Columbia v. Heller*, declared that the Second

---

convert[s] a semiautomatic Glock pistol to a fully automatic machine gun."  [Det. Hearing, ECF No. 29, at 13:3-5 (Nov. 30, 2023)].  According to the Government, the Glock switch was created via "3D printing" in the South Florida area. *Id.* at 18:10-15; 21:12-16; 33:11-19.  The Government further proffered that the Defendant engaged in other sales of firearms, a silencer, and other MCDs on different dates before and after the date of the charged conduct.  *Id.* at 3:20-4:6, 21:22-22:5.  None of this information is considered by the Court in making its decision on the Motion; only the face of the Indictment, which charges the Defendant with knowingly possessing a single non-specific MCD and nothing else, is considered here.

Amendment grants an individual right to bear arms, but stated that this right "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[5] 554 U.S. 570, 626 (2008). The *Heller* Court discussed and recognized that *U.S. v. Miller*, 307 U.S. 174 (1939),[6] stands for the proposition that the Second Amendment does not protect those weapons "not typically possessed by law-abiding citizens for lawful purposes[.]"[7] *Id.* at 625. *Miller* does protect, however, those weapons which were "in common use at the time [the amendment was ratified],"[8] when there was a historical tradition of "prohibiting the carrying of 'dangerous and

---

[5] The Supreme Court "specifically stated that [*Heller*] was not meant to cast doubt on longstanding restrictions on the possession of firearms." *United States v. Goodlow*, 389 F. App'x 961, 969 (11th Cir. 2010); *see also United States v. White*, 593 F.3d 1199, 1205 (11th Cir. 2010) (upholding the longstanding federal prohibition of firearm possession by persons convicted of the misdemeanor crime of domestic violence); *but see United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023) (striking down 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by someone subject to a domestic violence restraining order, as violating the Second Amendment under *Bruen*), *cert. granted*, 143 S. Ct. 2688 (2023).

[6] In *Miller*, the Defendants were charged with knowingly transporting in interstate commerce a sawed-off shotgun in violation of the National Firearms Act. *Miller*, 307 U.S. at 175. The Supreme Court declared that the Second Amendment did not protect the right to possess sawed-off shotguns because the use of the weapons did not have a "reasonable relationship to the preservation or efficiency of a well regulated militia[,]" as the weapons were not "in common use" at the time of the founding when men would be called for service to militias. *Id.* at 178-79.

[7] The Court acknowledges the circular reasoning involved in *Heller*'s interpretation of *Miller*, and is not the first to note it. *See, e.g., D.C. v. Heller*, 554 U.S. 570, 721 (2008) (Breyer, J., dissenting) ("In essence, the majority determines what regulations are permissible by looking to see what existing regulations permit. There is no basis for believing that the Framers intended such circular reasoning."); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) (Easterbrook, J.) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity."). This argument made by Justice Breyer in his dissent was considered and rejected by the *Heller* Court, and must similarly be rejected here. *See Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("[Justice Breyer's] argument was made in dissent, though, illustrating that it was considered by the *Heller* majority and rejected. This argument was insufficient to carry the day in *Heller* and accordingly must fail here too.").

[8] Weapons not in existence at the time of the founding are still afforded Second Amendment protection. *See Heller*, 554 U.S. at 582.

unusual weapons.'" *Id.* at 627 (citing, among others, 4 Blackstone, *Commentaries on the Laws of England*, 148–149 (1769), and 3 B. Wilson, *Works of the Honourable James Wilson* 79 (1804)).

Thus, both circuit and district courts since *Heller* have found without exception that "firearms may be regulated [under the Second Amendment] either (1) because they are not in 'common use'— that is, not 'typically possessed by law-abiding citizens for lawful purposes,' like self-defense— and therefore fall outside the scope of the Second Amendment, or (2) because they are historically subject to regulation, such as 'dangerous and unusual' weapons." *Capen v. Campbell*, No. CV 22-11431-FDS, 2023 WL 8851005, at *7 (D. Mass. Dec. 21, 2023); *see also Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016); *United States v. Bachmann*, No. 8:23-CR-304-VMC-CPT, 2024 WL 730489, at *2 (M.D. Fla. Feb. 22, 2024) ("[T]he arms protected under the Second Amendment include[] those 'in common use at the time'[] and excluded 'dangerous and unusual weapons.'").

Note the core of this dominant interpretive approach (referred to throughout as "*Heller/Miller* analysis" or "the *Heller/Miller* approach"): while machineguns are literally "Arms," they are not the *type of* "Arms" that receive Second Amendment protection. This Court agrees and determines, based on unambiguous persuasive precedent since *Heller,* that "machineguns are dangerous and unusual and [] not in common use." *Bachmann*, 2024 WL 730489, at *2; *see also Hollis*, 827 F.3d at 448 ("[E]very one of our sister circuits that have addressed this issue have agreed that machineguns are dangerous and unusual weapons for the purposes of the Second Amendment."); *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804,* 822 F.3d 136, 142-43 (3d Cir. 2016) ("In case [*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010),] left any doubt, we repeat today that the Second Amendment does not protect the possession of machine guns. They

are not in common use for lawful purposes. . . . As such, *Heller* dictates that they fall outside the protection of the Second Amendment.") (citations omitted); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 408 (7th Cir. 2015) ("[M]ilitary-grade weapons (the sort that would be in a militia's armory), such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not [protected by the Second Amendment]."); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("[M]achine guns are highly 'dangerous and unusual weapons' that are not 'typically possessed by law-abiding citizens for lawful purposes'"); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) ("[F]ully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after[]*Heller*.") (Kavanaugh, J., dissenting); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."); *United States v. Lucero*, 43 F. App'x 299, 301 (10th Cir. 2002) ("I am not persuaded that . . . fully automatic 'machineguns' . . . are the type of arms subject to Second Amendment protection.") (Lucero, J., concurring).[9]

---

[9] The Defendant is correct that no Supreme Court or Eleventh Circuit decision has held *explicitly* that machineguns are beyond Second Amendment protection. [ECF No. 46 at 2; R&R, ECF No. 48 at 4 n.1]; *but see, e.g., Heller*, 554 U.S. at 622, 625 (rejecting a reading of *Miller*, 307 U.S. at 179, that would "mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional," and concluding that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."); *Staples v. United States*, 511 U.S. 600, 619-20 (1994) (allowing prosecution of knowing possession of machinegun under 26 U.S.C. § 5861(d), but requiring proof of *mens rea*); *Akins v. United States*, 312 Fed.Appx. 197, 200-01 (11th Cir. 2009) (affirming summary judgment and holding that Bureau of ATF's classification of an "Akins Accelerator," a device that increases the rate of fire of a semiautomatic weapon, as a machinegun was reasonable, comported with due process, and was not unconstitutionally vague).

Therefore, because of the statutory definition of "machinegun," neither actual machineguns nor MCDs receive Second Amendment protection.[10]

Despite the pronouncement of a new test in *Bruen*, the *Heller/Miller* analysis remains the same. Courts presented with the issue after *Bruen* have unambiguously found that "Second Amendment protections simply do not extend to machineguns (or in this case one that has been converted [into a machinegun])." *United States v. Jones*, No. 1:23-CR-126-TFM, 2023 WL 8374409, at *7 (S.D. Ala. Dec. 3, 2023); *see United States v. Hicks*, No. CR 23-65, 2024 WL 1840326, at *5 (W.D. La, Apr. 26, 2024); *United States v. Berger*, No. 5:22-CR-00033, 2024 WL 449247, at *7 (E.D. Pa. Feb. 6, 2024) ("[T]he Second Amendment does not protect machineguns because they are not in common use for lawful purposes such as self-defense, as recognized by [all] circuit courts of appeals which have addressed the issue . . . . [D]istrict courts in [circuits which have not addressed the issue] are unanimous in concluding that machineguns are unprotected."); *United States v. Simien*, 655 F. Supp. 3d 540, 553 (W.D. Tex. 2023) ("[M]achineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment protection and [Defendant's] facial challenge to § 922(o), therefore, fails."); *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710, at *2 (N.D. Ill. July 26, 2023); *United States v. Kazmende*, No. 1:22-CR-236-SDG-CCB, 2023 WL 3872209, at *1 (N.D. Ga. May 17, 2023), *report and recommendation adopted*, No. 1:22-CR-00236-SDG, 2023 WL 3867792

---

[10] Under this *Heller/Miller* approach, courts have determined that MCDs are afforded Second Amendment protection based on whether *actual machineguns* are afforded Second Amendment protection. *See, e.g., United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012); *Bachmann*, 2024 WL 730489, at *1; *United States v. Fisher*, No. 1:23-CR-00045-MR-WCM, 2024 WL 589115, at *3 (W.D.N.C. Feb. 13, 2024); *Jones*, 2023 WL 8374409, at *7; *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710, at *3 (N.D. Ill. July 26, 2023); *United States v. Hoover*, 635 F. Supp. 3d 1305, 1325-26 (M.D. Fla. 2022). This Memorandum and Opinion adopts this approach as well. However, there is a second interpretive approach– that MCDs are not "Arms" at all, under a proper original understanding of the term– that this Court addresses below.

(N.D. Ga. June 7, 2023) ("Because machineguns are dangerous and unusual weapons that are outside the protection of the Second Amendment, Section 922(o) is not unconstitutional."); *Capen*, 2023 WL 8851005, at *7 ("[I]t appears to be clear . . . that the Second Amendment does not protect . . . machine guns."); *United States v. Hoover*, 635 F. Supp. 3d 1305, 1325 (M.D. Fla. 2022) (noting that the Defendant offered no basis to conclude that *Bruen* undermined the unanimous post-*Heller* line of cases which held "there is no Second Amendment right to possess a machine gun.").

Even though no court has found that *Bruen* abrogated the *Heller/Miller* approach removing machineguns from Second Amendment protection, *see* ECF No. 48, at 5 (Augustin-Birch, M.J.), the Defendant chastises these "out-of-circuit cases [offering] largely conclusory explanations that . . . are unconvincing[,]" Mr. Alsenat's Objections to the Magistrate Judge's Report and Recommendation, ECF No. 59, at 3. But the Defendant "has not provided any case law, from any circuit, holding that Second Amendment protections extend to machineguns," and fails to go beyond a conclusory proposition supposedly derived from *Bruen*. [ECF No. 48, at 4 n.1 (Augustin-Birch, M.J.)]. Filling the gap left by the Defendant, this Court now briefly explains how different variants of the *Heller/Miller* approach continue to remove machineguns (and because of the statutory definition, MCDs) from Second Amendment protection after *Bruen*.

     1. Machineguns are not "in Common Use."

Continuing the trail blazed by the *Heller/Miller* approach, *Bruen* reaffirmed that the Second Amendment is limited to only those weapons that are "in common use." *See Bruen*, 597 U.S. at 47 ("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large."); *Heller*, 554 U.S. at 627. Courts have used various, sometimes competing, tests to determine the definition of "in common use." First, some courts have asked "whether the firearm is the *general* type of weapon

that is in common use by ordinary citizens for lawful purposes such as self-defense[.]" *Capen*,

2023 WL 8851005, at *8 (emphasis in original) (finding that handguns, rifles and shotguns are the

general types of firearms in common use for lawful purposes, while machineguns, mortars, rocket

launcher, or shoulder-fired missile systems are not). Under this variant of *Heller/Miller* analysis,

a firearm "in common use" is protected by the Second Amendment, unless it is "dangerous and

unusual." *Id.*

Second, some courts have collapsed the analysis of "in common use" and "dangerous and

unusual" into a single test that asks, "whether the challenged regulation comports with the tradition

of regulating 'dangerous and unusual' weapons." *Id.*; *Bachmann*, 2024 WL 730489, at *2; *see

also*, Section A.2, *supra*.

Third, some courts look to the total extant number of the regulated firearm to determine if

it is "in common use." *See Simien*, 655 F. Supp. 3d at 553. Here, the Defendant relies heavily on

this approach by claiming that machineguns are "in common use" because the Department of

Justice stated that in April 2020 there were "726,000 machineguns lawfully possessed in the United

States[.]" [ECF No. 59 at 4 (citing U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms

and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2020*, 15–16

(2021), available at https://www.atf.gov/file/149886/download)]. This argument, however, has

been considered and rejected explicitly by other courts. *See Hollis*, 827 F.3d at 449 (finding that

the raw number, percentage, and proportion of machineguns in the United States is too small for

machineguns to be in common use); *Simien*, 655 F. Supp. 3d at 553 (finding that machineguns are

not in common use because they make up less than .2% of total firearms in the United States);

*Bachmann*, 2024 WL 730489, at *2. Simply put, the absolute number and relative proportion of

machineguns are "too insignificant for machineguns to be considered in common use." *Simien*,

655 F. Supp. 3d at 553; *see also Hollis*, 827 F.3d at 450 (noting that "Justice Alito [in *Caetano v. Massachusetts*, 577 U.S. 411 (2016)] did not think the absolute number [of weapons] by itself was sufficient."); [ECF No. 48 at 7 (Augustin-Birch, M.J.)].

Finally, some courts have reasoned that if many states restrict access to a particular firearm, it is not "in common use." *See Hollis*, 827 F.3d at 450. In this analysis, courts consider "the number of states that allow or bar a particular weapon[.]" *Id.* at 449; *see Caetano*, 577 U.S. at 420 (2016) (Alito, J., concurring). In *Caetano*, the Court found that Massachusetts could not ban stun guns and tasers, in part because there were hundreds of thousands legally sold to private citizens in forty-five states. *Caetano*, 577 U.S. at 420. However, "[t]he same showing cannot be made for machineguns." *Hollis*, 827 F.3d at 450 ("34 states and the District of Columbia prohibit possessing machineguns. Only 16 states have no such prohibition, but even some of these states have some sort of restriction affecting or limiting machinegun possession."). A vast majority of states prohibit machineguns; thus, under this analysis, machineguns are not "in common use."

This Court does not decide today which of these variants of the *Heller/Miller* analysis is the best statement of the law, because under any of these tests, machineguns are not "in common use." Also, whichever variant is used, under this dominant interpretive approach a court asks whether the particular *type* of firearm is consistent with the central consideration of the Second Amendment: the inherent right of self-defense. *Heller*, 554 U.S. at 628 (finding that handguns are in common use for the purpose of self-defense); *see also Bruen*, 597 U.S. at 29 (striking down a handgun restriction *because* it burdened self-defense). Machineguns, however, "are not used by every day law abiding American citizens for self-protection and self-defense[,]" *Bachmann*, 2024 WL 730489, at *2, because they "have no appropriate sporting use or use for personal protection[,]" *United States v. Hernandez*, No. CR 22-122-GBW, 2024 WL 964213, at *4 (D. Del.

11

Mar. 5, 2024) (citing *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999)). Because machineguns are far more dangerous than necessary to protect oneself, they are not the type of general weapon in common use for a lawful purpose.

Through every metric that courts have used, this Court comes to the same outcome – machineguns, and therefore MCDs, are not "in common use."

2.  Machineguns Are "Dangerous and Unusual"

While the *Heller/Miller* analysis neither provides a succinct list of weapons beyond the ambit of the Second Amendment, nor a roadmap for courts to use to determine the definition of "dangerous and unusual," the Court in *Heller* stated that it would be "startling" if "restrictions on machineguns . . . might be unconstitutional[.]" 554 U.S. at 624. It is against this backdrop that courts applying *Heller/Miller* have determined whether a firearm is "dangerous and unusual."

"An object is 'dangerous' when it is 'likely to cause serious bodily harm.'" *Henry*, 688 F.3d at 640. (citing *Black's Law Dictionary* 451 (9th ed. 2009)). All firearms, by their very nature, are dangerous – they are "designed to kill or inflict serious injury." *Capen*, 2023 WL 8851005, at *9. "Accordingly, for the term 'dangerous' to have any meaning at all, it must be refined in some way, or it will simply apply to every type of firearm." *Id.*; *see also Caetano*, 577 U.S. at 417-18 (noting that the definition of "dangerous" must be beyond "designed and constructed to produce death or great bodily harm" and "for the purpose of bodily assault or defense" because otherwise "virtually every . . . arm would qualify as 'dangerous'"). For this variant of *Heller/Miller* analysis to be meaningful, machineguns must be *distinctively* dangerous relative to firearms more generally. *Capen*, 2023 WL 8851005, at *9.

Under federal law, a machinegun is defined as a "weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual

12

reloading, by a single function of the trigger[,]" or, "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun[.]" 26 U.S.C. § 5845(b); *see also Staples v. United States,* 511 U.S. 600, 602 n.1 (1994) (Thomas, J.) ("[Machineguns fire] repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted."). When using a machinegun, a shooter can, without reloading, "fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry,* 688 F.3d at 640 ("Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns."); *see Capen,* 2023 WL 8851005, at *9 ("A light machine gun [] can fire many hundreds of rounds per minute[.]"). A weapon which can fire hundreds, if not thousands, of rounds per minute is not just dangerous, but *unreasonably* dangerous. *See United States v. Cruz-Olavarria,* 919 F.3d 661, 665 (1st Cir. 2019) (affirming lower court's view that "machine guns are *distinctively* dangerous") (emphasis added); *Hernandez,* 2024 WL at *4 ("Compared to weapons that are in common use (*e.g.*, handguns), [machineguns] are *exceptionally* dangerous.") (emphasis added).

Similarly, the Supreme Court in *Heller* did not specifically delineate when a weapon is "unusual." Some courts have asked whether the type of weapon is common in society, *see Friedman,* 784 F.3d at 409; *Simien,* 655 F. Supp. 3d at 553, while others have based the determination on whether the weapon comports with the essential purpose of the Second Amendment– self-defense, *see Capen,* 2023 WL 8851005, at *10 (noting that "it would add nothing to the analytic framework if an 'unusual' weapon were simply deemed to be one not 'in common use.'"). Under either formulation, machineguns are "unusual." First, as discussed above,

machineguns are both absolutely and relatively uncommon in the United States.   Second,

machineguns are unsuitable as a weapon for self-defense:

> [*Heller*] stated that "the American people have considered the handgun to be the
> quintessential self-defense weapon" [because it] is easier to store in a location that
> is readily accessible in an emergency; it cannot easily be redirected or wrestled
> away by an attacker; it is easier to use for those without the upper-body strength to
> lift and aim a long gun; and it can be pointed at a burglar with one hand while the
> other hand dials the police.

> If a handgun has features that make it more suitable for self-defense, it follows that
> other firearms may have features—including not only capabilities, but also size,
> length, and weight—that make them less suitable for that purpose. Thus, for
> example, while a machine gun certainly could have self-defense uses, it would be
> a highly unusual weapon to carry on a city sidewalk or to keep at a bedside in case
> of an intruder, even if it were legal to possess one.

*Capen*, 2023 WL 8851005, at *10 (quoting *Heller*, 554 U.S. at 629).   Machineguns are unusual

weapons both because of their lack of commonality and because they are ill-suited for self-

defense— the core of the Second Amendment.

The only justification the Defendant gives for the proposition that machineguns should not

be considered "dangerous and unusual," is that "self-defense" offers a legitimate purpose of

machinegun ownership.   [ECF No. 59, at 3-4].   This conclusory statement, given without any

support or evidence, is plainly insufficient and incorrect.   Defendant has not shown that a

machinegun (or an MCD) would promote self-defense and, as discussed above, self-defense is not

a persuasive justification for machinegun ownership.

Thus, this Court concludes that machineguns (and, by extension, MCDs) are "dangerous

and unusual" under any formulation of *Heller/Miller* analysis and are not afforded Second

Amendment protection.

B. A Machinegun Conversion Device Is Not an "Arm" Under the Second Amendment.

So far, this Court does not plow any new ground. But the Indictment challenged here does not allege the possession of a weapon or firearm at all; instead, it alleges only the knowing possession of an MCD which, as defined by Congress in 26 U.S.C. § 5845(b), is a "machinegun" for purposes of 18 U.S.C. § 922(o)(1). The Indictment only alleges that Defendant possessed an MCD by itself, without any connection or proximity to any firearm or other firearm components. The Court assumed, for the purposes of the above analysis, that MCDs are "Arms" under the Second Amendment, and then proceeded with *Heller/Miller* analysis of whether the devices are "in common use," or "dangerous and unusual," and concluded on those grounds (as have many other courts) that they should not be afforded Second Amendment protection.

On the facts presented by this Indictment, however, this Court concludes alternatively that an MCD, possessed by itself, is not an "Arm" under the Second Amendment at all, and thus is not entitled to any Second Amendment protection— regardless of any *Heller/Miller* analysis. Therefore, the statutes underlying the Indictment as applied to the Defendant are constitutional.

MCDs fall within the criminal prohibition embodied in Section 922(o)(1) only because Congress has defined MCDs as "machineguns" by statute. *See* 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b). Congress clearly has the authority to make all laws it deems necessary and proper, consistent with constitutional limits. *See generally,* U.S. Const., art. I, § 8, cl. 18; *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 6 (1966) ("Within the limits of the constitutional grant, the Congress may, of course, implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim."). Congress's inclusion of MCDs in the definition of "machinegun," however, does not control whether an MCD is an "Arm" under

the Second Amendment.[11]   Congress cannot independently define or expand the scope of a

constitutional right by statute, so this Court must engage in its own analysis to determine whether

a conversion device is an "Arm." *See Bruen*, 597 U.S. at 17 ("In keeping with *Heller*, we hold

that when the Second Amendment's plain text covers an individual's conduct, the Constitution

presumptively protects that conduct."); *id.* at 19 ("Step one of the predominant framework is

broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as

informed by history."); *cf. also City of Boerne v. Flores*, 521 U.S. 507, 545 (1997) (O'Connor, J.,

dissenting) ("In short, Congress lacks the ability independently to define or expand the scope of

constitutional rights by statute."); *Nevada Dept. of Hum. Res. v. Hibbs*, 538 U.S. 721, 728 (2003)

("*City of Boerne* also confirmed, however, that it falls to this Court, not Congress, to define the

substance of constitutional guarantees.").

When it comes to the "plain textual" meaning of the term "Arms" in the Second

Amendment, as informed by history,[12] the most comprehensive statement was provided by Justice

Scalia in *Heller*. Here is the section of Justice Scalia's opinion that defines "Arms" in full:

---

[11] Throughout our history, the Supreme Court has explained that the power to define criminal offenses and to prescribe the punishments to be imposed upon conviction resides wholly with Congress. *See United States v. Hudson & Goodwin*, 11 U.S. 32, 34 (1812); *United States v. Wiltberger*, 18 U.S. 76, 95 (1820); *Ex parte United States*, 242 U.S. 27, 42 (1916). Of course, it is fundamental within our constitutional system that Congress cannot enlarge or diminish constitutional rights by statute. *See, e.g., Osborn v. Bank of United States*, 22 U.S. 738, 827-28 (1824) (explaining that Congress can prescribe a uniform rule of naturalization but cannot enlarge or abridge the rights of a citizen).

[12] The Supreme Court has explained that historical sources are relevant because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (emphasis in original) (quoting *Heller*, 554 U.S. at 634–35). Our inquiry then, looks squarely at the year the Second Amendment was ratified (1791), and relevant historical sources that shed light on what "the people" understood the term "Arms" to mean at that time.

Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary *defined "arms" as "[w]eapons of offence, or armour of defence."* 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary *defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."* 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

*The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity.* For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays,* & c. and not bear other arms." See also, *e.g.,* An Act for the trial of Negroes, 1797 Del. Laws ch. XLIII, § 6, in 1 First Laws of the State of Delaware 102, 104 (J. Cushing ed.1981 (pt. 1)); *see generally State v. Duke,* 42 Tex. 455, 458 (1874) (citing decisions of state courts construing "arms"). Although one founding-era thesaurus limited "arms" (as opposed to "weapons") to "instruments of offence *generally* made use of in war," even that source stated that all firearms constituted "arms." 1 J. Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794) (emphasis added).

Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g., Reno v. American Civil Liberties Union,* 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the Fourth Amendment applies to modern forms of search, *e.g., Kyllo v. United States,* 533 U.S. 27, 35–36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), *the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.*

We turn to the phrases "keep arms" and "bear arms." Johnson defined "keep" as, most relevantly, "[t]o retain; not to lose," and "[t]o have in custody." Johnson 1095. Webster defined it as "[t]o hold; to retain in one's power or possession." No party has apprised us of an idiomatic meaning of "keep Arms." *Thus, the most natural reading of "keep Arms" in the Second Amendment is to "have weapons."*

*Heller,* 554 U.S. at 581-82 (emphasis and bold type added).[13]

---

[13] Continuing from where Justice Scalia started, Webster's 1828 definition of "Arms" provides, in relevant part, as follows (emphasis and bold type added): "1. Weapons of offense, or armor for defense and protection of the body . . . 4. *In law, arms are any thing which a man takes in his hand in anger, to strike or assault another."* "Weapon" is defined in the same Webster's edition, in relevant part, as follows: "1. Any instrument of offense; any thing used or designed to be used in destroying or annoying an enemy. *The weapons of rude nations are clubs, stones and bows and arrows. Modern weapons of arms are swords, muskets, pistols, cannon and the like."*

Given the above historical definitions, an MCD, possessed by itself, is not an "Arm" protected by the Second Amendment. An MCD by itself is not a "weapon of offence" or "any thing that a man . . . useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581. Instead, possession of an MCD is prohibited because Congress decided to prohibit the possession of a part or combination of parts that is "designed and intended . . . for use in *converting a weapon into a machinegun*[.]" 26 U.S.C. § 5845(b) (emphasis added). As the Tenth Circuit explained about firearm silencers, "[an MCD] is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019) (holding that silencers are not "Arms" because they are not "inherently useful 'in case of confrontation' as a 'weapon of offence' or an 'armour of defence'"), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Accessories, or "accoutrements" to firearms have long been distinguished from "Arms" under the Second Amendment. *See Capen*, 2023 WL 8851005, at *17 ("[T]here was a clear distinction between 'arms' and 'accoutrements' during the founding and reconstruction eras.") (citations omitted). Accessories to firearms fall outside the scope of the Second Amendment because they "generally have no use independent of their attachment to a gun" and cannot be used to "hurt anybody with [them] unless you hit them over the head[.]" *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387 (D.R.I. 2022), *aff'd*, 95 F.4th 38 (1st Cir. 2024) (finding that the plaintiffs did not establish that large capacity magazines ("LCMs") are "Arms" under the Second Amendment because they are merely accessories to firearms); *see Hasson*, 2019 WL 4573424, at *2, 4 ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case,

barrel, primer, or gunpowder . . . A silencer is not a weapon in and of itself, but simply a 'firearm accessory,' and therefore not a "bearable arm" protected by the Second Amendment.") (citation omitted). Just as silencers and LCMs derive their entire purpose from their attachment to a firearm, an MCD has no purpose beyond its attachment to and conversion of a firearm, and therefore are merely "accessories," or "accoutrements," to firearms, not "Arms" themselves. *Cf. Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009) (describing an "apparatus for accelerating the cyclic firing rate of a semiautomatic firearm[,]" as an "accessory").

This reasoning holds even though ammunition also has no use outside of their connection with firearms. Bullets, unlike MCDs, silencers, or LCMs, are *essential* to the operation and purpose of a firearm and integral to the classification of a firearm as a "weapon of offence." *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("The right to keep and bear arms . . . implies a corresponding right to obtain the bullets necessary to use them[.]"). MCDs, on the other hand, are not an essential aspect of the functionality of a firearm– they simply convert a firearm into a far more dangerous type.

This Court is *not* claiming that every part of a firearm, when separated from the firearm, would fail to receive protection as an "Arm" if considered individually. The frame or receiver of a firearm for example, just as with ammunition, is a fundamental component part of a firearm's basic functionality. *Cf. United States v. Stines*, 34 F.4th 1315, 1319 (11th Cir. 2022) (equating "weaponry" with "component parts for weaponry" for purposes of U.S.S.G. § 2M5.2); *United States v. Gresham*, 118 F.3d 258, 265 (5th Cir. 1997) ("[W]e join the majority of courts in holding that component parts are 'firearms' for purposes of § 922(g)(1)."); *United States v. Luce*, 726 F.2d 47, 49 (1st Cir. 1984); *New York v. Arm or Ally, LLC*, No. 22-CV-6124 (JMF), 2024 WL 756474, at *5 (S.D.N.Y. Feb. 23, 2024) (explaining that unfinished frames and receivers are "firearms" that

must be sold subject to restrictions imposed by federal law); *see also* 18 U.S.C. § 921(a)(3) (defining the term "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device").

The MCD allegedly possessed by Defendant here was not attached to any weapon; it was not sold with any weapon; it was not possessed with any weapon. Based on the face of the Indictment, the MCD was merely possessed by the Defendant as an accessory to a theoretical firearm. Therefore, as applied to the Defendant, Section 922(o) and the statutory definitions it employs are constitutional, because the MCD at issue in this case was not an "Arm" under the plain text of Second Amendment.

## III.   **Conclusion**

For important reasons surrounding the history of Second Amendment doctrine, the dominant interpretive approach has removed machineguns from Second Amendment protection because, although they are undeniably weapons in the literal sense, they have been held not to be the type of weapons that have historically been protected. While the undersigned adheres to that reasoning, it need not do so here. This case contains distinctive facts that mandate an important legal result: the knowing possession of an MCD alone is not the keeping or bearing of an "Arm" at all.

As the Indictment and procedural posture of this Motion show, we live in a time when a miniscule object can convert a weapon manufactured by others into a far more dangerous weapon. The object is not, by itself, "dangerous" or "in common use" (although, that may be changing

fast).[14] Though technology continues to evolve, the plain text of our Constitution does not: possessed by itself, the miniature object is a not an "Arm" as originally understood at the time of the Second Amendment's ratification, and thus the Second Amendment has nothing to say about Congress's regulation of it. Congress may regulate MCDs so long as the regulation stems from an authorized grant of constitutional power. There is no claim here that Congress lacks such authority.[15]

Given the foregoing, the Court concludes that the Indictment is constitutionally sufficient, because it clearly "sets forth the essential elements of the crime." *Yonn*, 702 F.2d at 1348. The Defendant's Motion to Dismiss Indictment Under the Second Amendment [**ECF No. 35**] is **DENIED,** and U.S. Magistrate Judge Augustin-Birch's Report and Recommendation [**ECF No. 48**] is **ADOPTED in full** as part of this Memorandum and Order.

**DONE and ORDERED** in the Southern District of Florida on May 20, 2024.



**DAVID S. LEIBOWITZ**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

[14] *See, e.g.,* Press Release, DOJ, Justice Department Announces Publication of Second Volume of National Firearms Commerce and Trafficking Assessment: Report Presents Unprecedented Data on Crime Gun Intelligence and Analysis (Feb. 1, 2023), https://www.atf.gov/news/pr/justice-department-announces-publication-second-volume-national-firearms-commerce-and. ("The data also reveals emerging technological trends. For instance, in the last five years, the number of illegal machine gun conversion devices that law enforcement agencies reported being recovered has increased by an alarming 570%.").

[15] The Motion does not include any argument that the statutes underlying the Indictment are beyond, for example, Congress's Article I powers, so none is considered here. *See generally, United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) (explaining importance of the party presentation principle).